[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-10918

Non-Argument Calendar

_____

WELLEKSON GONÇALVES SILVA,

Petitioner-Appellee,

*versus*

ANDRIENE FERREIRA DOS SANTOS,

Respondent-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:22-cv-03371-ELR

_____

Before Rosenbaum, Luck, and Brasher, Circuit Judges.

PER CURIAM:

The Hague Convention on the Civil Aspects of International Child Abduction (the "Convention"), Oct. 25, 1980, T.I.A.S. No. 11670, and its implementing legislation, the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001–9011, govern international child abductions during domestic disputes. The Convention ordinarily mandates a child's return to their country of habitual residence if the child has been wrongfully removed. But it also provides certain exceptions, including one for when a court finds that a child's return would put the child at a grave risk of physical or psychological harm. We refer to this as the "grave risk" exception.

In 2021, Respondent-Appellant Adriene Ferreira dos Santos left Brazil with her daughter, Y.F.G., and eventually entered the United States. The child's father, Petitioner-Appellee Wellekson Gonçalves Silva, shared custody of Y.F.G., and he petitioned for the child's return to Brazil under the Convention and ICARA.

Dos Santos believes this case fits within the "grave risk" exception. She has proffered evidence that Silva has repeatedly physically abused her and others, including in front of Y.F.G., and that he has emotionally abused Y.F.G. Based on this evidence, dos Santos contends that Y.F.G.'s return to Brazil would impose a significant risk of harm on the child. Meanwhile, Silva denies that he has

abused dos Santos or Y.F.G. and argues that there is no significant risk of harm to the child in Brazil.

Following a bench trial at which both parents testified, the district court ordered that Y.F.G. be returned to Brazil. The district court expressly found Silva not to be credible, but because the district court concluded that dos Santos did not provide independent corroboration to support her own testimony, the district court found she had not established by clear and convincing evidence a "grave risk" of harm to Y.F.G. in Brazil.

After careful review of the record, we conclude that the district court applied an erroneous legal standard in weighing the conflicting testimony. Accordingly, we vacate the district court's order and remand for further consideration.

## I.      BACKGROUND

### A.      *Factual Background*

Dos Santos and Silva met in 2011 in Brazil. They have one child together, their daughter Y.F.G., who was born in 2012 in Guanhães, Brazil. The three lived together in Guanhães until April 2020, when dos Santos and Silva separated.

Dos Santos submits that her relationship with Silva was plagued by frequent abusive incidents, which caused her to fear for her own safety and her daughter's well-being. She testified about several of these incidents. On dos Santos's telling, the abuse began during her pregnancy when Silva beat her, dragged her around the

house, held her by her neck until she couldn't breathe, and told her that he would remove the baby from her belly with his own hands.

But the abuse did not end there, dos Santos said. Rather, she testified that the beatings continued after Y.F.G. was born, including an incident where Silva tied dos Santos up with an electrical cord and told her to say goodbye to the world because it would be her last day—all of which occurred in front of a crying Y.F.G. Dos Santos also recounted several times when Silva pointed a gun at her, which she said happened so often that she "lost [her] count," as well as an incident in which Silva dragged dos Santos by her hair in front of Y.F.G., who yelled at Silva to let dos Santos go. Dos Santos estimated that she was abused almost every day.

Dos Santos also testified that she was not the only victim of Silva's violence. She said she observed an incident in which Silva told dos Santos's grandmother that he would "explode her house with dynamite," and after she asked him to leave, Silva pushed dos Santos's grandmother, causing her to fall and break two ribs.

According to dos Santos, Silva's abuse reached even the family's pet kitten. Dos Santos recalled a sadistic incident in which Silva fed the kitten to a pit bull, and as the kitten neared its death, Silva set the kitten on fire. Later, she said, Silva described burning the family's kitten to Y.F.G.

Silva also allegedly inflicted purely psychological harm on dos Santos, including an instance in which he used social networks to share intimate photos of dos Santos that he had taken when they lived together.

After dos Santos and Silva separated in 2020, Y.F.G. initially lived with dos Santos.  Later that year, dos Santos obtained a restraining order against Silva, prohibiting him from, among other things, coming within 100 meters of dos Santos.  Brazilian records indicate that Silva repeatedly violated the restraining order and that he was arrested and imprisoned under the "decree of preventative imprisonment."[1]  Following his release, Silva filed a lawsuit to confirm his custodial rights, and in June 2021, a Brazilian judge ordered that dos Santos and Silva share custody of Y.F.G.

In August 2021, dos Santos left Brazil with Y.F.G. and traveled to the United States.  She did so without Silva's consent to move Y.F.G. to the United States.  After Silva learned that Y.F.G. was in the United States, he filed an application with the Brazilian government for the return of Y.F.G. under the Convention.  The Brazilian government referred the matter to the United States Department of State—the United States's central authority under the Convention.

*B.*     *Procedural Background*

In August 2022, in federal district court, Silva filed a Petition under the Convention seeking Y.F.G.'s return to Brazil.

---

[1] After the arrest, Y.F.G. pressured dos Santos to help secure Silva's release, and dos Santos withdrew the restraining order.  The withdrawal certificate suggests that Silva's absence had "caus[ed] suffering" to Y.F.G. and that Silva "d[id] not constitute a danger to the minor."

Consistent with the Convention's directive to "use the most expeditious procedures available," Convention, Art. 2, the district court conducted a bench trial in February 2023. Several witnesses testified at trial, including both Silva and dos Santos.

In his testimony, Silva largely denied dos Santos's allegations of abuse. Specifically, he testified that he never hit or threatened her and that he did not push dos Santos's grandmother or kill the family's pet kitten. Although Silva acknowledged that he had been arrested in Brazil for crimes involving his sales business and for an incident in which in damaged dos Santos's car, he maintained that he had not been arrested for violence involving his daughter. When asked about the intimate photos of dos Santos that were posted online, Silva testified that his computer was taken during a robbery at his store, after which the photos ended up online.[2]

After Silva testified and before dos Santos took the stand, the district judge said, "I want to know whether anyone actually witnessed these so-called incidents on which [dos Santos] is relying to establish an affirmative defense. That's really all I'm interested in."

Dos Santos then testified and recounted the many instances of alleged abuse and violence, as we've mentioned. Besides discussing these incidents, dos Santos's testimony also included a

---

[2] Besides Silva, Silva's brother and Silva's grandmother provided brief testimony. Silva's brother said he had seen Silva get angry with dos Santos but had not seen physical violence. Both witnesses testified that they had not seen Silva abuse Y.F.G.

description of an altercation between Silva and dos Santos's subsequent boyfriend and an incident in which Silva damaged dos Santos's car. According to dos Santos, a neighbor captured the car-damage incident on video. But neither the boyfriend nor the neighbor testified during the bench trial, nor did dos Santos offer the video recording into evidence.[3]

Dos Santos's counsel called two other witnesses to testify at trial. One was Roberta Campos, who was a friend of dos Santos's grandmother, has known dos Santos for many years, and traveled from Brazil to the United States with dos Santos and Y.F.G. Campos testified about having observed dos Santos with bruises and about an incident in which Y.F.G. screamed while Silva beat dos Santos.[4] The other witness was Lucas Pimenta, dos Santos's fiancé. He testified about threatening social media messages that he received that he believed came from Silva.[5]

The district court then presented its factual findings. It began by expressly discrediting Silva's testimony. As the district court explained, Silva did not deny some of the allegations, instead

---

[3] Another potential witness, dos Santos's grandmother, passed away.

[4] During cross-examination, Silva's counsel sought to impeach Campos with evidence that she had been arrested for trafficking drugs with dos Santos

[5] Dos Santos's counsel sought to call two more witnesses who were physically located in Brazil—Arlene Campos and Bianca Camargo, who were identified as dos Santos's friend and niece, respectively. But because of technical difficulties, they could not testify.

arguing that there were no documents to help prove them.  The district court also pointed to specific defects in Silva's testimony including, for example, that Silva's story about his computer being stolen "ma[de] no sense to [the district court]," and that Silva "would not even acknowledge that there were any disagreements or any tumultuous relationship between himself and [dos Santos]." So the court "d[id not] find that [Silva] has credibility," and reiterated that "he's not very credible at all."

Despite expressly discrediting Silva's testimony, the district court found that dos Santos had not met her burden to prove by clear and convincing evidence that Y.F.G. is at grave risk.  While dos Santos testified about several distinct incidents, "on many of the points," the district court explained, dos Santos "was the only one who testified to these points."  The court found that it was "curious" that she presented no documents to corroborate allegations of broken ribs nor were there police reports that supported any of these incidents.  And the district court noted that many of the alleged incidents occurred several years before dos Santos and Y.F.G. came to the United States.

To sum up its findings, the court said,

[D]espite the court's concerns about the child being returned to Brazil and being with her father because I do—it does sound like there are some issues with the father; I cannot deny that that is my impression based on what I've heard in terms of possible anger management issues, and, and terms of making threats to

people—but, still, the court's hands are tied in the ab-
sence of the respondent meeting her burden of proof
by clear and convincing evidence.  And, again, I find
that she has not.

The district court therefore granted Silva's petition for re-
turn of the child under the Convention and ICARA.  It also denied
dos Santos's motion to stay its order pending appeal.  In denying
the stay, the district court concluded, among other things, that the
*Brown* line of cases, which holds that "a statement by a [criminal]
defendant, if disbelieved by the jury, may be considered as *substan-
tive evidence* of the defendant's guilt," *United States v. Brown*, 53 F.3d
312, 314 (11th Cir. 1995) (emphasis in original), has no application
in civil cases.  This Court then granted dos Santos's emergency mo-
tion to stay the district court's order pending appeal.

## II.   STANDARDS OF REVIEW

In a proceeding under the Convention, we review a district
court's factual findings for clear error and its legal conclusions de
novo.  *Gomez v. Fuenmayor*, 812 F.3d 1005, 1007 (11th Cir. 2016).
The clear-error standard is "highly deferential," and we uphold the
district court's factual determinations "so long as they are plausible
in light of the record viewed in its entirety."  *Id.* at 1007–08 (citation
omitted).  "Whether a grave risk of harm to a child exists under the
terms of the Hague Convention is a mixed question of law and fact,

which we review de novo." *Baran v. Beaty*, 526 F.3d 1340, 1345 (11th Cir. 2008).[6]

## III.    DISCUSSION

We first discuss the Convention and ICARA's legal framework as well as the Supreme Court's and our precedent applying it.  We then turn to the facts here and explain the legal standard that governs the determination here.

### A.    *We have applied the "grave-risk" exception in cases with severe allegations of abuse.*

The Hague Convention "was adopted in 1980 in response to the problem of international child abductions during domestic disputes." *Golan v. Saada*, 142 S. Ct. 1880, 1888 (2022) (quoting *Abbott v. Abbott*, 560 U.S. 1, 8 (2010)).  The United States and Brazil are both signatories.  *See* Hague Conference on Private Int'l Law, Convention of 25 Oct. 1980 on the Civil Aspects of Int'l Child Abduction, Status Table.[7]  In 1988, Congress implemented the Convention through ICARA.   The   International   Child   Abduction

---

[6] In *Golan v. Saada*, the Supreme Court held that, within the grave-risk analysis, an appellate court reviews a district court's consideration of potential ameliorative measures for abuse of discretion.  142 S. Ct. 1880, 1895 (2022).  Because our decision is based on the district court's misunderstanding of the controlling legal standards, which we continue to review de novo (even after *Golan*), we need not determine whether *Golan* impacts our standard of review when a district court applies the correct legal standards in a grave-risk analysis.

[7] https://www.hcch.net/en/instruments/conventions/status-table/?cid=24

Remedies Act, 102 Stat. 437 (1988), as amended, 22 U.S.C. §§ 9001–
9011; *Golan*, 142 S. Ct. at 1889.  ICARA permits a person seeking
relief under the Convention "to file a petition for return of a child
in state or federal court," and directs reviewing courts to "'decide
the[se] case[s] in accordance with the Convention.'"  *Golan*, 142 S.
Ct. at 1889 (quoting 22 U.S.C. § 9003(d)) (alterations in original).

    The Convention's "core premise" is that children's interests
in custody matters "are best served when custody decisions are
made in the child's country of 'habitual residence.'"  *Monasky v. Ta-
glieri*, 140 S. Ct. 719, 723 (2020) (quoting Convention Preamble).
For that reason, the Convention "ordinarily requires the prompt
return of a child wrongfully removed or retained away from the
country in which she habitually resides."  *Id.*

    But that general rule has certain exceptions, including Arti-
cle 13(b) of the Convention, which applies when "'there is a grave
risk that [the child's] return would expose the child to physical or
psychological harm or otherwise place the child in an intolerable
situation.'"  Convention, Art. 13(b); *see also Golan*, 142 S. Ct. at 1888
n.2 (describing Convention's other exceptions).  The Supreme
Court has referred to the "grave risk" exception as the Conven-
tion's "[p]rime" exception.  *Monasky*, 140 S. Ct. at 723.  After all, the
Convention "is designed to protect the interests of children and
their parents, and children's interests may point against return in
some circumstances."  *Golan*, 142 S. Ct. at 1893 (citation omitted).

    Ordinarily, ICARA first requires that the party petitioning
for a child's return establish by a preponderance of the evidence

that the child was "wrongfully removed or retained within the meaning of the Convention." 22 U.S.C. § 9003(e)(1). Here, though, no one disputes that Silva has established his prima facie case that dos Santos wrongfully removed Y.F.G. from Brazil.

Instead, this case turns solely on the application of the Convention's "grave risk" exception. And on that point, as the party opposing return, dos Santos bears the burden to establish "by clear and convincing evidence" that the exception applies and that Y.F.G. should therefore not be returned. *Id.* § 9003(e)(2).

Several contemporaneous commentators elaborated on the meaning of the Convention's "grave risk" exception. The Convention's official commentary, for example, explains that the Convention's general goal of preventing children's removal "gives way before the primary interest of any person in not being exposed to physical or psychological danger or being placed in an intolerable situation." Elisa Perez-Vera, *Explanatory Report: Hague Conference on Private International Law*, ¶ 29, *in* 3 Acts and Documents of the Fourteenth Session 426 (1980).[8] And the U.S. Department of State noted that "[t]he person opposing the child's return must show that the risk to the child is grave, not merely serious." Hague

---

[8] We have recognized that "Perez-Vera was the official reporter of the Hague Conference and her report is recognized 'as the official history and commentary on the Convention and is a source of background on the meaning of the provisions of the Convention.'" *Gomez*, 812 F.3d at 1011 n.1 (quoting *Ruiz v. Tenorio*, 392 F.3d 1247, 1252 n.2 (11th Cir. 2004)). *See also Golan*, 142 S. Ct. at 1893 n.8 (relying on Perez-Vera commentary).

International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10,494, 10,510 (Mar. 26, 1986).[9]  To illustrate this principle, the State Department provided a few examples:  the exception was not intended to encompass situations in which money at home is scarce or where educational opportunities are more limited, but the exception does cover instances in which a parent sexually abuses a child and the court's denial of the petition "would protect the child from being returned to an 'intolerable situation.'" *Id.*

We have previously considered several cases in which the district court found that the "grave risk" exception was satisfied.

In *Baran*, we affirmed the district court's denial of a father's petition to return a child to Australia after the child's mother had fled to the United States to escape the father's abuse.  526 F.3d at 1346.  The district court found, among other things, that the father was emotionally unstable and prone to uncontrolled destructive outbursts of rage, was physically and verbally abusive towards the child's mother in the child's presence, and physically endangered the child, both intentionally and unintentionally.  *Id.* at 1345–46.  We explained that the district court "was not required to find [the child] had previously been physically or psychologically harmed" to deny return.  *Id.* at 1346.  Instead, the district court had to find

---

[9] "It is well settled that the Executive Branch's interpretation of a treaty is entitled to great weight." *Abbott*, 560 U.S. at 15 (citation and internal quotation marks omitted).  *See also Golan*, 142 S. Ct. at 1892 (relying on State Department commentary).

only that the child's return "would expose him to a present grave risk" of harm. *Id.*

We likewise affirmed a district court's denial of a mother's petition to return a child to Venezuela in *Gomez*. 812 F.3d at 1015. There, the district court found that the father endured repeated threats on his life from the child's mother and her new partner, and that the child's mother had likely been responsible for several incidents including a shooting of the father's girlfriend and the planting of drugs in the child's paternal grandmother's car. *Id.* at 1008–09, 1012. We affirmed the district court's findings and rejected the petitioning mother's arguments that the child should be returned because the risks the child's father faced were irrelevant to the child. *Id.* at 1012–13. We explained that the "grave risk" exception may apply "where violence is directed at a parent that may threaten the well-being of a child." *Id.* at 1013. This rule is justified by "the powerful effect that a pattern of serious violence directed at a parent may have on his children." *Id.* at 1014. After all, "it requires no stretch of the imagination to conclude that serious, violent domestic abuse repeatedly directed at a parent can easily be turned against a child." *Id.*

> B.    *The district court made two legal errors.*

Turning to this case, the district court expressed "concerns about the child being returned to Brazil and being with her father" because, in the court's view, "there are some issues with the father," including "possible anger management issues" and "making threats to people." But the district court felt its "hands [were] tied"

because the only evidence of the incidents dos Santos described was dos Santos's testimony.  Indeed, even before dos Santos testified and the court could evaluate her credibility on the stand, the district court emphasized that "really all [it was] interested in" was "whether anyone actually witnessed these so-called incidents on which [dos Santos] is relying to establish an affirmative defense." So even though the district court expressly found that Silva's testimony was not credible and did not make a similar finding as to dos Santos, it concluded that dos Santos did not meet her burden to establish the harm Y.F.G. faced in Brazil.

We believe this reasoning reflects two legal errors. *Cf. Walsh v. Walsh*, 221 F.3d 204, 218 (1st Cir. 2000) (correcting district court's legal analysis after district court "raised the article 13(b) bar higher than the Convention requires").  First, given that Silva testified about the alleged abuse and the district court expressly did not believe him, under our precedent, it's not necessarily the case that dos Santos's testimony was uncorroborated.  And second, even without independent corroboration, a factfinder's belief in a single witness's testimony alone can be sufficient to satisfy a party's burden to prove a fact by clear and convincing evidence.

Either error alone requires us to vacate and remand for further consideration under the correct standard.  And both together provide all the more reason that we must remand.

1.  *Given the district court's finding that Silva was not credible, the district court could have chosen to consider Silva's testimony as corroborating evidence that the return of Y.F.G. to Brazil represents a "grave risk" to the child.*

We begin by observing that, on this record, it is not necessarily the case that dos Santos's testimony was uncorroborated. As we've noted, the district court explained several times that it did not believe Silva's testimony, in which he denied committing violent acts. In fact, as the district court saw things, some of Silva's explanations "ma[de] no sense." Not only that, but the district court pointed out that Silva himself did not even bother to deny some of the incidents, instead simply responding to the allegations by saying that dos Santos did not have documentation to prove them.

The Supreme Court has explained that the demeanor of a witness "may satisfy the tribunal, not only that the witness' testimony is not true, but that the truth is the opposite of his story." *NLRB v. Walton Mfg. Co.*, 369 U.S. 404, 408 (1962) (per curiam) (citation and quotation marks omitted). A witness's denial when he "has a motive to deny," the Court continued, "may be uttered with such h[e]sitation, discomfort, arrogance or defiance, as to give assurance that he is fabricating, and that, if he is, there is no alternative but to assume the truth of what he denies." *Id.*; *see also Wright v. West*, 505 U.S. 277, 296 (1992) (plurality opinion) ("[I]f the jury did disbelieve West, it was further entitled to consider whatever it concluded to be perjured testimony as affirmative evidence of guilt.").

We have applied this principle many times.  For instance, in
*United States v. Eley*, we held that "[a] false explanatory statement
may be viewed by a jury as substantive evidence tending to prove
guilt."  723 F.2d 1522, 1525 (11th Cir. 1984).  As we explained there,
the defendant's "explanation [was] so implausible that it g[ave] rise
to positive evidence in favor of the government."  *Id.*  *Brown* pro-
vides another example:  we held there that a criminal defendant
who chooses to take the stand "runs the risk that if disbelieved the
[factfinder] might conclude the opposite of his testimony is true."
53 F.3d at 314 (citation and internal quotation marks omitted).  And
if the factfinder disbelieves the defendant's testimony, his state-
ment can be used against him "as *substantive evidence* of [his] guilt."
*Id.* (emphasis in original).  *See also United States v. Margarita Garcia*,
906 F.3d 1255, 1273 (11th Cir. 2018) (explaining that a defendant
who testifies "runs 'the risk that in so doing he will bolster the Gov-
ernment case enough for it to support a verdict of guilty'" (quoting
*McGautha v. California*, 402 U.S. 183, 215 (1971)).

We've also relied on this straightforward principle outside
the criminal context.  For instance, in *Swaters v. Osmus*, a presiding
judge did not believe a testifying litigant's explanation for his failed
drug test that resulted in revocation of his pilot certificate.  586 F.3d
1315, 1320 (11th Cir. 2009).  We noted the significance of the
judge's express finding that the litigant "was *not* a credible witness,"
and we explained that "[t]hat determination itself can be regarded
as substantive evidence in favor of the [judge's] ultimate conclu-
sion" against that litigant.  *Id.* at 1323 (emphasis in original).  We
added that the judge's adverse conclusion about the litigant's

credibility served as an "independent source of support" for the decision.  *Id.*

Of course, it makes sense that a factfinder can use a witness's noncredible testimony as corroborating substantive evidence against the witness's interests, regardless of whether the case arises in the civil or criminal context.  Consider a practical example:  if a witness denies having hit someone and the factfinder does not believe that witness, then necessarily, the factfinder has concluded that the witness did hit someone.

Here, that means the district court could consider its lack of faith in Silva's testimony as corroborating substantive evidence that dos Santos's allegations are true.  In invoking the "grave risk" exception, dos Santos accused Silva of engaging in physical violence and emotional and physical abuse.  Silva testified and, for the most part, denied that the alleged instances of abuse happened.

But the district court expressly found that Silva was "not very credible at all."  It said that it didn't find him to be "believable" and expressed concerns about his "issues," including "possible anger management issues" and "making threats to people."  In other words, the district court observed Silva's testimony and determined that he was not trustworthy.

By testifying, Silva risked that the district court would not believe him or find him to be a credible witness.  And because the district court did not believe him, it could have chosen to consider Silva's testimony as corroborating substantive evidence that the alleged abusive incidents did, in fact, occur.  In this way, the district

court had the option of considering Silva's testimony as corroborative of dos Santos's testimony.  In other words, dos Santos's testimony was not necessarily uncorroborated on this record because the district court could have found that Silva's noncredible denials and non-denial denials corroborated dos Santos's assertions about the physical violence and physical and emotional abuse.

Our dissenting colleague emphasizes that the district court was permitted to—but was not required to—consider Silva's noncredible testimony as corroborating substantive evidence in dos Santos's favor.  That is surely true.  But it's also irrelevant here.  Rather, the problem here is that the district court did not know that, so the district court never considered whether to rely as corroborating substantive evidence on Silva's denials and non-denial denials of burning the family cat, breaking dos Santos's grandmother's ribs, and assaulting and emotionally abusing dos Santos.

We know that the district court did not know that it could consider testimony it found noncredible as corroborating substantive evidence because the district court expressly said so.  In its order denying dos Santos's motion for stay pending appeal, the district court acknowledged that dos Santos "cite[d] several criminal appeal cases in her motion to support the argument that testimony by a litigant, if disbelieved by the trier of fact, may be substantive evidence of guilt." Doc. No. 77 at 4 n.1 (cleaned up).  In evaluating that argument, the district court said, "[e]ven if [these cases] were applicable in this civil context, *which they are not*, none of [dos Santos's] citations support that the undersigned . . . was required to

find 'guilt' based on either Parties' lack of credibility." *Id.* (emphasis added).  So we know that the district court was under the mistaken impression that this rule did not apply in the civil context.  We also know that although the district court observed that the rule is permissive, not mandatory, the district court expressed no position on whether, had it known the rule applied in the civil context, it would have relied on Silva's noncredible testimony as corroborating substantive evidence in considering whether dos Santos satisfied her clear-and-convincing evidence burden.

And that is the problem.  Because the district court did not know that it could consider Silva's noncredible testimony as corroborating substantive evidence, it had no reason to consider—and certainly did not announce—how that information might have affected its decision.

The Dissent disagrees.  It says that the district court already decided not to view what it found to be the noncredible testimony of Silva as corroborating substantive evidence.  But the district court's order on which the Dissent relies supports no such conclusion.[10]  To be sure, if it intended to do so, the district court *could*

---

[10] The district court wrote,

> Respondent cites several criminal appeal cases in her motion to support the argument that "[t]estimony by a litigant, if disbelieved by the trier of fact, may be substantive evidence of guilt."  However, it is unclear to the Court how this demonstrates a strong likelihood of success on appeal in this case given that, by Respondent's own characterizations, these cases

*have* said that even if the corroborating-substantive-evidence rule applies outside the criminal context, it would have chosen not to apply it. And had the district court done so, we would have respected that. *Cf. United States v. Keene*, 470 F.3d 1347, 1349 (11th Cir. 2006) (affirming criminal sentence after district court explained that it would have applied the same sentence even if it calculated sentencing guidelines incorrectly). But that's not what the district court said.

As the Dissent points out, *see* Dissent at 12, the district judge here is experienced, and she knows how to say what she means. So we take her at her word. And her words studiously avoided saying that she would not rely on Silva's denials and non-denial denials as substantive evidence. Instead, her words said only that even if the rule applies, it's a permissive, not a mandatory, one. Indeed, the district judge stated that she made her observation to explain why "it is unclear to the Court how [the non-mandatory, permissive nature of the corroborating-substantive-evidence rule] demonstrates a strong likelihood of success on appeal." In other words, the court concluded only that, because nothing required the district court to rely on Silva's statements as substantive evidence, dos Santos could

---

only support that the finder of fact *may* infer guilt in a criminal trial based on a litigant's testimony. Even if they were applicable in the civil context, which they are not, none of Respondent's citations support that the undersigned—the trier of fact at the February 17, 2023 evidentiary hearing—was *required* to find "guilt" based on either Part[y's] lack of credibility.

Doc. No. 77 at 4 n.1 (Citation omitted).

not show that this Court would find a substantial likelihood that the district court reversibly erred.  After all, the district court made these remarks to explain why it was denying a stay—and one of the "most critical" factors in determining whether to grant a stay is whether the movant has shown a substantial likelihood of success on the merits.  *See Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1317 (11th Cir. 2019).

But one thing the district court's statement unambiguously did not do was indicate that the court already determined how it would weigh Silva's testimony if it could consider that testimony as corroborating substantive evidence.  And the Dissent's argument to the contrary reads something into the order that just isn't there.

That said, we do not suggest that, on remand, the district court must consider Silva's testimony as corroborating substantive evidence that he presents a "grave risk" to Y.F.G.  The district court observed Silva testify, and whether to consider that testimony as corroborating substantive evidence against Silva is entirely with the purview of the district court.  *See Golan*, 142 S. Ct. at 1895–96 (explaining applicable legal standard and allowing district court "to apply the proper legal standard in the first instance").  But the district court was mistaken when it concluded that it did not have the choice to consider Silva's noncredible denials as evidence supporting dos Santos's testimony.

2. <u>*A single witness's testimony alone and uncorroborated by*</u>
<u>*any other evidence can support a finding by clear and con-*</u>
<u>*vincing evidence.*</u>

The district court's second error was concluding that a single witness's testimony is necessarily insufficient to satisfy the clear-and-convincing-evidence standard.   Neither the Convention, ICARA, nor governing precedent requires a respondent to provide independent corroboration to establish that a child would face a "grave risk" of harm if they were returned to their resident country. Instead, ICARA requires that the respondent provide "clear and convincing evidence" that the exception applies.   22 U.S.C. § 9003(e)(2).  And that standard does not necessarily mandate that a witness's testimony be corroborated to be credited by the fact finder.[11]

---

[11] Contrary to the Dissent's suggestion that this argument was not raised, dos Santos specifically argued in her brief that "[t]he fact that the trial court did not repudiate [dos Santos's] testimony could support a non-frivolous argument that an appellate court should reverse the trial court altogether and remand for entry of judgment on behalf of [dos Santos]."  She further elaborated, asserting,

> The fact that appellate courts give substantial deference to a district court's fact-finding doesn't mean that they accept fact-finding that is completely dependent upon credibility determinations that have not been articulated.  While a district court's credibility determinations are entitled to deference, district courts must still sufficiently explain those credibility determinations to allow for meaningful review by an appellate court. In other words, a trial court cannot leave an appellate court in

Returning to the criminal context, we've held that a witness's "uncorroborated testimony" can be "sufficient to support a conviction if it is not on its face incredible or otherwise unsubstantial." *United States v. Milkintas*, 470 F.3d 1339, 1344 (11th Cir. 2006); *see also United States v. Nerey*, 877 F.3d 956, 969 (11th Cir. 2017) ("[T]estimony of a co-conspirator, even if uncorroborated, is sufficient to support a conviction." (citation omitted)).  So it's no surprise that we've also said that if a witness's uncorroborated testimony can be "sufficient to support a conviction," it can also be "sufficient for purposes of the 'clear and convincing' rule." *United States v. Trevino*, 565 F.2d 1317, 1319 (5th Cir. 1978).[12]  *See also* Eleventh Circuit Pattern Jury Instructions (Civil Cases) 3.4 (2022) ("The number of witnesses testifying concerning a particular point doesn't necessarily matter."); Eleventh Circuit Pattern Jury Instructions (Criminal Cases) B5 (2022) (same).  Along those same lines, we do not always require corroboration in the immigration context because "[i]f an alien's testimony is credible, it may be sufficient, without corroboration, to satisfy his burden of proof in establishing

---

the position of speculating as to how the evidence was weighed.

(Citations omitted).  These arguments tee up the issues that dos Santos's testimony was sufficient to result in judgment in her favor and that the district court's explanation for its findings was not sufficient to allow an appellate court to determine that the district court understood the legal standards.

[12] Decisions of the former Fifth Circuit issued before October 1, 1981, are binding on this Court.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

his eligibility for relief from removal." *Kueviakoe v. U.S. Att'y Gen.*, 567 F.3d 1301, 1304 (11th Cir. 2009).

These examples illustrate that dos Santos could have satisfied her burden to establish "clear and convincing evidence" based on only her own testimony. Unlike with Silva's testimony, the district court did not discredit dos Santos's testimony. If the district court credited her testimony and believed that Silva was, in fact, responsible for the various abusive incidents, the district court could have reasonably concluded that dos Santos established that Y.F.G.'s return to Brazil risked physical or psychological harm to the child. *See Gomez*, 812 F.3d at 1014 ("[I]t requires no stretch of the imagination to conclude that serious, violent domestic abuse repeatedly directed at a parent can easily be turned against a child.").

Our dissenting colleague believes that we should assume that the district court understood that dos Santos's testimony alone could satisfy her burden because, in the Dissent's view, the record does not "explicitly indicate that the district court did not understand the law." Dissent at 9. We respectfully disagree.[13]

---

[13] The Dissent refers to the district judge's years of experience on the bench to affirm the decision below. To be clear, no one questions the district court's credentials or its ability to discern and apply the correct legal standard in the usual case. Nor are we in any way assuming that the district court "do[es]n't know the law." Dissent at 12. But no judge is infallible or immune from committing error. *Cf. Dietz v. Bouldin*, 579 U.S. 40, 53 (2016) ("All judges make mistakes. (Even us.)"). And correcting legal errors is what appellate courts do.

For starters, before dos Santos even began her testimony—
that is, before the district court had any opportunity to evaluate dos
Santos's credibility and determine whether her testimony alone
might provide clear and convincing evidence—the district court
said that "all [it was] interested in" was "whether anyone actually
witnessed these so-called incidents on which [dos Santos] is relying
to establish an affirmative defense."   In other words, the district
court indicated that it believed that dos Santos's testimony alone
could not, under any circumstances, be enough to carry her bur-
den.

The Dissent says we have taken this statement out of con-
text and that the district court's use of the word "anyone" referred
to only the paternal uncle and the paternal great-grandmother.
Dissent at 9–10.  But we are comfortable that our characterization
accurately reflects what happened.   Indeed, we think the record
speaks for itself in that respect.   After all, it's clear that when the
district court expressed its concern about "whether *anyone* actually
witnessed these so-called incidents on which [dos Santos] is rely-
ing," it meant whether "anyone" (as that inclusive word is com-
monly understood), other than dos Santos (who hadn't yet testi-
fied) witnessed the events—not just whether "the paternal uncle
and the paternal great-grandmother" did, as the Dissent urges.  No
other interpretation makes sense.  In fact, the paternal uncle and
the paternal great-grandmother were witnesses for Silva, so the dis-
trict court had no reason to have expected them to offer testimony
indicting him.   Nor does the Dissent offer any reasonable

explanation as to why we should read an artificial limit into the district court's plain words.

The record also contains another indication that the district court did not know that it could rely solely on dos Santos's testimony to find clear and convincing evidence if it was so moved. At the end of the hearing, when the district court explained its findings, it again emphasized that, in its view, the record contained no independent corroboration to support dos Santos's testimony. The court found that dos Santos did not meet her burden because she "was the only one who testified" to the allegations and because there were no documents or video evidence to support dos Santos's testimony. Based on these "explicit indications in the record," Dissent at 9, we must conclude that the district court erroneously believed that dos Santos's testimony alone was insufficient to meet the clear-and-convincing standard.

The Dissent suggests that the district court's comments on dos Santos's inability to recall specifically when violent incidents occurred or Y.F.G.'s age at the times of these incidents shows that the district court knew it could consider dos Santos's testimony alone in determining whether dos Santos established clear and convincing evidence of "grave risk." Once again, we must disagree with the Dissent's view of the record. While the district court noted dos Santos's inability to provide precise timeframes, it also showed that it believed dos Santos's testimony about the threat Silva posed. Indeed, the district court voiced its "concerns about the child being returned to Brazil and being with her father"

because the court believed "there are some issues with the father," including "anger management issues" and "making threats to people." Yet the district court felt its "hands [were] tied" because dos Santos did not meet her burden—and it thought she did not meet her burden because she did not provide corroborating substantive evidence. On this record, we cannot be sure how the district court would evaluate the testimony if it knew its hands were not tied and that dos Santos's testimony alone could fulfill her burden.

Of course, as with the question of whether to treat Silva's discredited testimony as corroborating substantive evidence that he presents a "grave risk" of harm to Y.F.G., we do not decide whether, on this record, dos Santos met the requisite standard and satisfied her ultimate burden. That determination remains for the district court to decide on remand.

## IV.   CONCLUSION

In sum, when a factfinder does not believe an interested witness's testimony, it may—but is not required to—consider that witness's discredited testimony as corroborating substantive evidence that the opposite of the testimony is true. And when a single witness provides the only evidence on some point, that testimony, without corroboration, can still meet the standard of clear and convincing evidence if the factfinder concludes that it is credible. Because the district court's reasoning did not account for these principles, we vacate the district court's order and remand for further consideration in light of this opinion.

23-10918              Opinion of the Court              29

**VACATED AND REMANDED.**

23-10918                        LUCK, J., dissenting                        1

LUCK, Circuit Judge, dissenting:

The Hague Convention on the Civil Aspects of International Child Abduction "was adopted in 1980 in response to the problem of international child abductions during domestic disputes." *Golan v. Saada*, 142 S. Ct. 1880, 1888 (2022) (quotation omitted). "[T]he Convention generally requires the 'prompt return' of a child to the child's country of habitual residence when the child has been wrongfully removed to or retained in another country." *Id.* This general rule is based on the "core premise" that "the interests of children in matters relating to their custody are best served when custody decisions are made in the child's country of habitual residence." *Id.* (cleaned up).

But the Convention has exceptions. Return, for example, "is not required if there is a grave risk that return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." *Id.* (cleaned up). This grave-risk exception is "narrowly construed," *Baran v. Beaty*, 526 F.3d 1340, 1345 (11th Cir. 2008), and the parent opposing removal has the burden of showing by clear and convincing evidence "that return would expose the child to a grave risk of harm," *Golan*, 142 S. Ct. at 1889.

Adriene Ferreira dos Santos wrongly removed her daughter from the girl's habitual residence in Brazil and from the lawful joint custody of her father, Wellekson Gonçalves Silva, and abducted her to the United States. No one disputes this. Normally, that would mean the child would be promptly returned to Brazil. *See id.* But the mother claimed that the grave-risk exception applied.

2                          Luck, J., dissenting                    23-10918

So the district court held an evidentiary hearing on the grave-risk exception.  It heard from the child's father, her paternal uncle, her paternal great-grandmother, her mother, her mother's family friend, and her mother's fiancé.  After considering the evidence, the district court found that the mother had "failed to establish by clear and convincing evidence that the child will face a grave risk of physical or psychological harm should she be returned to Brazil."  Without an established exception, the district court granted the father's petition for return of the child.

The mother asks us to reverse the return order, arguing that the district court failed to:  (1) explain its credibility determinations; (2) make a specific finding on the mother's testimony describing abuse; and (3) use its disbelief of the father as corroborating substantive evidence of abuse.  The majority opinion picks up on this last point and adds (4) that the district court also erred by "concluding that a single witness's testimony is necessarily insufficient to satisfy the clear-and-convincing standard."  I respectfully dissent.

First, the mother contends that the district court's "one paragraph order directing the return of the child to Brazil provides no explanation whatsoever regarding its credibility determinations."  The district court, the mother maintains, did not "sufficiently explain [its] credibility determinations to allow for meaningful review by an appellate court."

I disagree.  Before issuing its written order, the district court sufficiently explained its credibility determinations—and the basis

23-10918               Luck, J., dissenting                    3

for them—at the evidentiary hearing.  The district court began by
explaining why it found the father "not very credible at all":

> I don't find that the [father] was believable.  He didn't
> even deny certain incidents but, instead, pretty much
> hinted at that nobody could prove them because there
> were no lawsuits filed, there were no medical docu-
> ments, and he kept saying that over and over again.
>
>        And this story about the computer being stolen
> makes no sense to me, that a computer is stolen, no
> indication that anyone had any access to his password
> or anything, and then somehow, some way, photos
> from that computer start appearing on social media.
> So I don't find that [the father] has credibility.
>
>        And as [the mother] just pointed out, the [fa-
> ther] would not even acknowledge that there were
> any disagreements or any tumultuous relationship
> between himself and the [mother].

The district court then explained that, despite the father's
lack of credibility, the mother "did not" meet her burden of show-
ing by "clear and convincing evidence" that the child would be in
grave danger if returned:

> [The mother] came in and testified to many in-
> cidents that happened.  But on many of the points,
> she was the only one who testified to these points.
> Wasn't brought out until the court asked that her
> grandmother was deceased, so that may explain why

her grandmother was not present to testify or available.

Still, the court finds that it's curious that, with injuries as serious as broken ribs, there isn't some kind of documentation or some other witness that could corroborate that.

The court didn't see any police reports, at least none presented at trial—we heard mention of them—that corroborated any of these reports. A witness, Ricardo, was brought up by [the mother] that witnessed some of this. We didn't hear any from him—anything from him. . . .

He could certainly have testified by Zoom, even if he couldn't get to our courtroom to testify in person.

We heard of a witness named Monique who supposedly witnessed some of this. Nothing from her during this trial did we hear, either. We only heard about her and what she witnessed from [the mother].

We heard about a video of some car vandalism that was committed by the [father]. And I think, unless I'm remembering this incorrectly, that he acknowledged some portion of something being done to the car. There was some issue of slapping a car or some kind of term I wasn't really sure about. But, certainly, if there is some kind of video that the

[mother] herself testified about, seems like we would
have seen that at trial.  Didn't see that as well.

      Also, the incidents that were described were
very hazy in the sense that there was no specific time.
We didn't even get close to establishing a time for
many of the incidents.  Many of the incidents, it was
established, were several years ago.  We don't know
how old the child was.  That was fuzzy.

This explanation belies the mother's second argument,
which was that the district court "made no specific finding" as to
her testimony describing "extraordinarily outrageous violence and
abuse."  But the district court *did* make findings that the mother
hadn't met her burden to prove the grave-risk exception because
she didn't present obvious and available corroborating evidence
and her testimony was hazy and not specific.

As to the lack of corroboration, the district court found that
the mother didn't offer any medical records, police reports, or wit-
ness testimony to verify the serious injuries she claimed the father
inflicted—even though she testified, for example, that he broke her
grandmother's ribs.  The district court also found that Ricardo "cer-
tainly could have testified by Zoom," but it "didn't hear . . . any-
thing from him," even though the mother testified that Ricardo
witnessed abuse.  The district court added that it heard "[n]othing
from [Monique] during this trial . . . either," even though the
mother testified that Monique also witnessed abuse.  The district
court said that it would've expected for the video of the father van-
dalizing the mother's car to be presented at trial, but it "[d]idn't see

6                      LUCK, J., dissenting                    23-10918

that as well," even though the mother claimed a video existed. And the district court found it "curious" that the hearing was the first time that the father's alleged abuse had been discussed in a court, even though the mother "had the opportunity to raise those old incidents in the Brazil court to determine the custody."

As to the lack of detail in the mother's testimony, the district court found that the mother's testimony was "very hazy" and "no[t] specific." "[T]he incidents that" the mother "described," the district court explained, "were very hazy in the sense that there was no specific time. We didn't even get close to establishing a time for many of the incidents."

The mother's third argument (picked up by the majority opinion) is that, because the district court found the father's testimony "not believable and lack[ing] credibility," it could and should have used its "disbelief of [his] testimony" as corroborating "substantive evidence" that he abused the mother. For its part, the majority opinion adds that the district court "did not know" it could use the father's incredible testimony as corroborating substantive evidence because the district court said the legal principle didn't apply to civil cases.

But, in its order denying the stay motion, the district court stressed that, even if it could consider the father's incredible testimony as corroborating substantive evidence, it wouldn't be "*required*" to find for the mother "based on either [p]arties' lack of credibility." In other words, the district court already conveyed that, even assuming it could consider the father's incredible denials

as corroborating substantive evidence for the mother, it wouldn't do so. (This is why the district court found that the mother was not "likely to succeed on appeal.") The district court heard the father's testimony but didn't view it as corroborating substantive evidence supporting the grave-risk exception, and no one has pointed to anything requiring the district court to do so. There's nothing new for the district court to decide on remand.

The majority opinion takes a cramped view of the stay order. The district court, the majority opinion says, "studiously avoided saying that [it] would not rely on [the father's] denials and non-denial denials as substantive evidence." But the district court did not studiously avoid the issue. The mother sought a stay because the father's testimony, even "if disbelieved by the trier of fact, may be substantive evidence." The district court addressed that issue head-on, explaining that, even assuming it may use incredible testimony as corroborating substantive evidence, it was not "*required* to find 'guilt' based on either [p]arties' lack of credibility," and then found that the mother was not likely to succeed on the same argument she makes now. Even under the best of circumstances, we do not require that judicial decisions have the metaphysical precision the majority opinion demands. *Cf. Nealy v. Warner Chappell Music, Inc.*, 60 F.4th 1325, 1332 (11th Cir. 2023) ("We cannot read a court's opinion like we would read words in a statute. Instead, when interpreting and applying words in a judicial opinion, we must consider the context, such as the question the court was answering, the parties' arguments, and facts of the case." (citations omitted)). And these were not the best of circumstances.

8                          Luck, J., dissenting                          23-10918

The district court had extra time pressure to issue its stay order because this case was brought under the Convention. *See Chafin v. Chafin*, 742 F.3d 934, 936–37 (11th Cir. 2013) ("The Supreme Court has recommended that courts take steps to decide these cases as expeditiously as possible, for the sake of the children who find themselves in such an unfortunate situation." (cleaned up)).

Finally, in an argument not raised by the parties, the majority opinion contends that the district court erred by "concluding that a single witness's testimony is necessarily insufficient to satisfy the clear-and-convincing evidence standard."[1]    For this, the

---

[1] Compare that argument to the one the mother makes.  She argues that the

> fact that the trial court did not repudiate the [mother's] testimony could support a non-frivolous argument that an appellate court should reverse the trial court altogether and remand for entry of judgment on behalf of [the mother]. . . .

> The fact that appellate courts give substantial deference to a district court's fact-finding doesn't mean that they accept fact-finding that is completely dependent upon credibility determinations that have not been articulated.  While a district court's credibility determinations are entitled to deference, district courts must still sufficiently explain those credibility determinations to allow for meaningful review by an appellate court.  In other words, a trial court cannot leave an appellate court in the position of speculating as to how the evidence was weighed.

The mother's argument does not tee up the argument the majority opinion makes.  They are different.  The majority opinion argues that the district court *erred by making a finding* that the mother's testimony was insufficient as a

23-10918            LUCK, J., dissenting                    9

majority opinion points to two statements the district court made
at the evidentiary hearing as explicit indications in the record show-
ing it "erroneously believed that [the mother's] testimony alone
was insufficient to meet the clear-and-convincing standard":
(1) the court's statement that "I want to know whether anyone ac-
tually witnessed these so-called incidents on which [the mother] is
relying to establish an affirmative defense. That's really all I'm in-
terested in"; and (2) the statement that, "on many of the points,
[the mother] was the only one who testified." But neither of these
statements explicitly indicate that the district court did not under-
stand the law.

        As to the first statement, the majority opinion hyper-focuses
on the word "anyone" and takes it out of the context in which it
was used. Here's the full context:

        The Court:  Okay.  We are back on the record
        following lunch.

        We're going to go with our next witness.

        Let me just give you all some parameters here.
        It's going to be a short witness, as these next witnesses
        are. The court is not interested in hearing testimony
        about the kind of relationship these two had, whether

_____

matter of law to prove the grave-risk exception. The mother, on the other
hand, argues that the district court *erred by not making findings* about the
mother's testimony that would allow for meaningful appellate review.

they were good people, how much criminal history they have.

I want to know whether anyone actually witnessed these so-called incidents on which [the mother] is relying to establish an affirmative defense. That's really all I'm interested in.

And the way that I see it, [father] only needs to ask a couple of questions, then we go to [the mother] and see what they are going to try to bring out, and then, again, I give [the father] the chance to redirect if you need to straighten up some stuff. But basically you're just establishing whether they witnessed these things.

So you may proceed with your next witness.

The district court's reference to "anyone" was to the witnesses taking the stand right after the lunch break: the paternal uncle and the paternal great-grandmother. The district court wanted to know whether these "short witness[es]" saw the father behave abusively. It was trying to focus their brief testimony on the issue it had to decide—the grave-risk exception—and to avoid the irrelevant testimony that had bogged down the hearing before the lunch break. Nothing about the context shows that the district court believed that the mother's testimony was "necessarily insufficient" to satisfy the exception. At worst, the statement, in context, was ambiguous, and we must read "ambiguous oral statements" by the district court "to be consistent (not inconsistent)

with the law." *See United States v. Rodriguez*, 751 F.3d 1244, 1259 (11th Cir. 2014) (explaining that, when we review district judges' "extemporaneous spoken words of explanation," we don't "assume that the district judges do not know the law" (quotation omitted)).

As to the statement that the mother was the only witness who testified to the abuse, the district court was stating a fact. The mother *was* the only one who testified about "many of the points." But this statement does not mean that the district court believed the mother's testimony was necessarily insufficient to prove the grave-risk exception. Not even close. The district court exhaustively ticked through the obvious and available corroborating evidence that the mother did not offer at the evidentiary hearing— medical and courts records, police reports, Ricardo, Monique, the video of the father vandalizing the mother's car.

Then, left with the mother's testimony, the district court found that, on certain points, she was "very hazy," "fuzzy," and "no[t] specific." If anything, these findings showed that the district court knew the mother's testimony *could* be used to prove the grave-risk exception. Otherwise, if the district court believed that the mother's testimony was necessarily insufficient as a matter of law, there wouldn't have been a need to discuss the quality and specificity of her testimony.

The majority opinion brushes the district court's explicit findings aside because, it claims, the district court "believed [the mother's] testimony about the threat [the father] posed" and still

found against the mother.  But that part of the majority opinion is not in quotes because the district court said no such thing.  The district court never found the mother's testimony believable.[2]  Instead, it explicitly found that her testimony was, in part, "very hazy," "fuzzy," and "no[t] specific."  The district court's "hands [we]re tied" because, with only uncorroborated and partially hazy, fuzzy, and nonspecific testimony, it could not find by clear and convincing evidence that there would be a grave risk to the child if she was returned to her habitual residence.  We shouldn't ignore the explicit findings the district court did make for findings it never made.  *See United States v. B. G. G.*, 53 F.4th 1353, 1366 (11th Cir. 2022) ("We cannot ignore the explicit good-faith finding that the district court actually made for an inconsistent implicit finding that the district court never made.").

The majority opinion ends by noting that all judges make mistakes.  Indeed, we do.  But what we don't do is assume that district judges don't know the law.  The district judge in this case has been on the bench for twelve years—first as a state trial court judge, and then, for the last eight years (and change), as a federal district judge.  She has presided over countless trials and heard countless evidentiary hearings.  After "listen[ing] to everything" and "tak[ing] everything into consideration" at the evidentiary hearing—including the mother's testimony—the district judge found that the mother didn't meet her burden to show by clear and

---

[2] Even the mother acknowledged that "the [d]istrict [c]ourt made no specific finding" about her testimony.

23-10918                LUCK, J., dissenting                13

convincing evidence that there would be a grave risk to the child if she were returned to Brazil.  We should not assume, without more than the majority opinion offers, that the district judge did not understand that the mother's testimony alone could satisfy the clear-and-convincing-evidence standard.

While we may have made different findings and reached different conclusions after hearing the same evidence, "[a]ssessing the weight of evidence and credibility of witnesses is reserved for the trier of fact." *Castle v. Sangamo Weston, Inc.,* 837 F.2d 1550, 1559 (11th Cir. 1988).  "It is emphatically not within the province of an appellate court to reweigh the evidence and the credibility of the witnesses at trial." *United States v. Hernandez*, 141 F.3d 1042, 1052 (11th Cir. 1998).  Because weight and credibility are reserved for the factfinder, and the mother hasn't shown any legal errors, I would affirm the district court's order.

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

May 26, 2023

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  23-10918-QQ
Case Style:  Wellekson Silva v. Andriene dos Santos
District Court Docket No:  1:22-cv-03371-ELR

All counsel must file documents electronically using the Electronic Case Files ("ECF") system,
unless exempted for good cause. Although not required, non-incarcerated pro se parties are
permitted to use the ECF system by registering for an account at www.pacer.gov. Information
and training materials related to electronic filing are available on the Court's website.
Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been
entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with
FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for
filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise
provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is
timely only if received in the clerk's office within the time specified in the rules. Costs are
governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for
attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested
Persons a complete list of all persons and entities listed on all certificates previously filed by
any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be
reheard must be included in any petition for rehearing or petition for rehearing en banc. See
11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming
compensation for time spent on the appeal no later than 60 days after either issuance of mandate
or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via
the eVoucher system. Please contact the CJA Team at (404) 335-6167 or
cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher
system.

Pursuant to Fed.R.App.P. 39, costs taxed against appellee.

Please use the most recent version of the Bill of Costs form available on the court's website at www.ca11.uscourts.gov.

Clerk's Office Phone Numbers

| | | | |
|---|---|---|---|
| General Information: | 404-335-6100 | Attorney Admissions: | 404-335-6122 |
| Case Administration: | 404-335-6135 | Capital Cases: | 404-335-6200 |
| CM/ECF Help Desk: | 404-335-6125 | Cases Set for Oral Argument: | 404-335-6141 |

OPIN-1A Issuance of Opinion With Costs